UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Herman Yoh,
              Petitioner,

              v.                       Civil Action No. 1:09-CV-18

Andrew Pallito, Commissioner,
Vermont Department of Corrections,
              Respondent.

## REPORT AND RECOMMENDATION
(Docs. 2, 8, 9, 12)

Petitioner Herman Yoh brings this petition for a writ of habeas corpus under 28

U.S.C. § 2254. (Doc. 2.) Yoh was convicted of first-degree murder in Vermont District

Court in 1999. He now claims that (1) the trial court admitted his confession in violation

of his Fifth Amendment right against compulsory self-incrimination and Fourteenth

Amendment right to due process, and (2) he was denied his Sixth Amendment right to

effective counsel. Respondent Andrew Pallito, the Commissioner of the Vermont

Department of Corrections, has moved to dismiss the petition.[1] (Doc. 8.) For the reasons

set forth below, I recommend that Yoh's petition and motion for an evidentiary hearing

(Docs. 2, 12) be DENIED, and that Respondent's Motion to Dismiss be GRANTED. I

further recommend that Respondent's Motion to Strike (Doc. 9) be DENIED as moot.

---

[1] Yoh originally named Robert Hofmann as the Defendant, however Hofmann is no longer
Commissioner of the Department of Corrections ("DOC"). As the current DOC Commissioner, Pallito is
automatically substituted as the Defendant. *See* Fed. R. Civ. P. 25(d); *Henault v. Hofmann*, 2009 WL
2526302, *2 (D. Vt. Aug. 19, 2009).

## I.      Factual Background

The following facts are taken from the Vermont Supreme Court decision, *State of Vermont v. Yoh*, 910 A.2d 853 (Vt. 2006), and from the state court record.  The body of Yoh's wife, Mary Yoh, was found on the side of a rural road in Williston, Vermont on March 7, 1998.  She had been strangled to death and there were bruises on her face.  Yoh was arrested for her murder, and, at trial, the prosecution claimed that Yoh killed Mary during the early hours of December 20, 1997.  In October 1999, a Vermont state jury convicted Yoh of first-degree murder, and the trial court sentenced him to life without the possibility of parole in April 2000.  As explained below, Yoh was later re-sentenced to a term of 30 years to life.

After finding Mary's body, police located Yoh in Reading, Pennsylvania, and Pennsylvania state troopers arrested him on March 18, 1998 for a Vermont state probation violation.  Before interviewing Yoh, the Pennsylvania troopers read him his *Miranda* rights,[2] and Yoh signed a form waiving those rights.  Per instructions from Vermont law enforcement personnel, the troopers did not inform Yoh that his wife's body had been found, instead asking Yoh if he had any information regarding her disappearance.  Yoh answered that he last saw Mary on December 20, 1997, the morning after they attended a

---

[2] The indelible "*Miranda* rights," typically given by law enforcement in the form of "warnings,"inform a suspect that he "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."  *Miranda v. Arizona*, 384 U.S. 436, 479 (1966).

Christmas party at the then-Radisson Hotel in Burlington, Vermont.  He said that he took Mary home after the party because she was ill from excessive drinking, and that he left her at home in the morning when he went to run errands and notify her employer that she would be staying home sick from work.  When he returned home, Yoh said, Mary was gone.  Despite Mary's unexpected disappearance, Yoh did not contact any authorities.  Instead, he said he remained in Vermont for another day before leaving for Reading, Pennsylvania, where his children and former wife lived.  Yoh was charged with Mary's murder after this interview.

Two days later, on March 20, 1998, Vermont State Police detectives Dane Shortsleeve and Thomas Nelson interviewed Yoh at the Pennsylvania State Police barracks.  The detectives provided a second round of *Miranda* warnings to Yoh, and then conducted a tape-recorded interview.  At first, the detectives persisted in the charade of a missing persons investigation, asking why she may have left and where she may have gone.  Yoh referred back to his first interview with the Pennsylvania troopers, and maintained his story that he last saw Mary when he left her–alive–to run errands on December 20.  After about two hours of questioning, the detectives told Yoh that Mary's body had been found and that she had been murdered.  Yoh acted surprised by this news, and said, "I figured by what you guys have said you were being honest, that she was a missing person."  (Doc. 7-23 at 89.)

After disclosing the demise of Mary Yoh, the detectives began accusing Yoh of committing the murder.  They told him that his story was inconsistent with certain

evidence, including autopsy results and witness accounts of Yoh and Mary fighting after the Christmas party. Yoh denied fighting with Mary, and continued to deny any role in her disappearance. Eventually, Yoh decided he no longer wanted to speak with law enforcement. He said, "You're trying to trip me up, you get an attorney in here or something." *Id.* at 101. Det. Shortsleeve assured Yoh that "I'm not trying to trip you up," and Det. Nelson asked Yoh, "[y]ou want to stop talking to us now?" *Id*. Yoh replied, "Yeah." *Id*.

Ignoring Yoh's request to stop the interview, Det. Shortsleeve continued to question Yoh, and tried to persuade him that he could help his own cause by portraying the murder as an accident. Shortsleeve said:

> You gotta start looking for the future. You expect to get out of jail before you're ninety years old, you need to tell us. Goes right here on the tape, you're not going to get another opportunity. You know we're talking to your family, you want to leave them with any good feelings, let us be able to tell them that this was an accidental thing. Tell us what happened in the room that night.

*Id*. at 103. Shortsleeve also misrepresented the evidence linking Yoh to Mary's murder, and told Yoh that this would be his last chance to cooperate. Shortsleeve said:

> Fibers, hair, DNA, fingerprints. Fingerprints off a dead body. Figure that one. You wouldn't think they could do it but they do it. Cold up in Vermont since December 19th and Mary's body was in good shape. DNA from the hotel, from your car, from the body, it's all pointing to one person.

*Id*. In fact, there were no fingerprints taken from Mary's body, and there was no DNA evidence–from the hotel, Yoh's car, or anywhere else–linking Yoh to Mary's death.

Yoh maintained his innocence, and said that he already told the detectives what happened. After several other statements about the strength of the state's case and Yoh's incentives to cooperate, Det. Shortsleeve concluded the interview without obtaining a confession from Yoh.

Approximately 30 to 40 minutes later, Yoh was in transport to an arraignment when he asked one of the Pennsylvania state troopers what the Vermont detectives would do next. The trooper said he did not know. Yoh asked again, and the trooper said he did not know, but that if it were his investigation, he would want to know whether Yoh's family possessed any relevant information. When Yoh and the trooper reached their destination, Yoh asked the trooper if they could speak in private. The trooper agreed, and took Yoh into an empty office. Yoh then said, "If you can keep those guys off my family, I will tell them everything they want to know." The trooper then brought Yoh back to the barracks, and told the Vermont detectives that Yoh wished to speak with them again. (Doc. 7-20, Trial Tr. vol. 2, 26-27, Oct 14, 1999.)

Detectives Nelson and Shortsleeve then read Yoh his *Miranda* rights a third time–and Yoh waived them a third time–before conducting Yoh's third custodial interview–the second with the Vermont detectives. Before proceeding, Yoh asked the detectives, "my family stays out of this, right?," and, referring to his family, Yoh said that, "[t]hese people down here are innocent." (Doc. 7-23 at 105.)

During this interview Yoh admitted that after the party on December 19 he and Mary retired to their hotel room where an argument ensued. He said that Mary threatened

5

to call the police, and when she went to pick up the phone he "blacked out," and then awoke to find Mary dead on the hotel bed. *Id.* at 108, 126. Yoh said that he could not remember killing Mary, but that no one else was in the room. Yoh also described wrapping Mary's body in a blanket, carrying the body to his car, and driving to the location where the body was discovered.

At the start of the third interview, Yoh negotiated a cigarette break with the detectives, saying, "[t]hat's part of the deal." *Id.* at 104. He later asked for, and received, that cigarette break about halfway through the interview. *Id.* at 114. And at the conclusion of the interview Yoh confirmed that he was neither threatened with nor promised anything to induce his statement. *Id.* at 129-130.

At trial, the videotape of Yoh's third interview, along with Det. Shortsleeve's testimony about the two interviews he conducted, were admitted into evidence without objection. Yoh's trial counsel decided he would not move to suppress Yoh's confession because his own investigation revealed no bases on which such a motion could succeed. (Doc. 26-6 at 16, 19-23.)

## II.     Procedural Background

Yoh appealed his conviction directly to the Vermont Supreme Court. On June 7, 2001, a Justice of the Vermont Supreme Court stayed his appeal so Yoh could file a petition for post conviction relief ("PCR") in Vermont Superior Court. *See* 13 V.S.A. § 1371. On January 31, 2005, the Superior Court denied Yoh's PCR petition on summary

judgment, and Yoh appealed this decision as well. The Vermont Supreme Court consolidated Yoh's direct and PCR appeals. *Yoh*, 910 A.2d at 857.

Yoh brought several claims on direct appeal, including that the trial court erred by admitting his confession into evidence. In his PCR petition, Yoh claimed that he was denied effective counsel in violation of the Sixth Amendment because, among other reasons, his trial counsel did not move to suppress his confession. The Vermont Supreme Court heard and decided both of these claims on his consolidated appeal.

The Vermont Supreme Court issued its decision, *State of Vermont v. Yoh*, 910 A.2d 853 (Vt. 2006), on September 8, 2006.[3] The court upheld Yoh's conviction, finding that his confession was properly admitted into evidence, and, therefore, his counsel was not ineffective for acquiescing to its use. However, the court vacated Yoh's life sentence as unconstitutional, and remanded to the district court for resentencing. *Id*. at 857. Finally, while the court affirmed summary judgment on Yoh's claim that his counsel did not move to suppress his confession, it found that disputed facts remained on an unrelated claim, and remanded the PCR petition for further proceedings. *Id*.

On July 23, 2008, Yoh entered into a written "sentencing agreement" with the state of Vermont, in which both parties agreed to the district court imposing a sentence of 30 years to life, with credit for time served since March 18, 1998. (Docs. 7-2 at 10; 7-17.)

---

[3] The court first issued an opinion on June 30, 2006, but issued an amended opinion on September 8, 2006 in response to Yoh's motion for reargument. (Docs. 8-8, 9.)

As part of the same agreement, Yoh also agreed that the remanded portions of his PCR petition should be dismissed with prejudice. *Id.*

Yoh filed the present petition on January 20, 2009, seeking federal collateral review of his state court conviction and a writ of habeas corpus. He now asserts two constitutional claims: (1) his confession was taken in violation of his Fifth Amendment right against compulsory self-incrimination and his Fourteenth Amendment right to due process, and was therefore inadmissible, and (2) his trial counsel's failure to move to suppress his confession deprived Yoh of his Sixth Amendment right to effective counsel. (Docs. 2, 12.)

## **Standard of Review**

Federal review of state criminal convictions is limited. Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant a state prisoner's habeas application unless the relevant state-court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or, "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. 2254(d)(1)-(2); *Knowles v. Mirzayance*, 129 S.Ct. 1411, 1418-19 (2009). "Clearly established Federal law" includes only "the holdings, as opposed to the dicta," of the Supreme Court's decisions at the time of the relevant state court decision. *Carey v. Musladin*, 549 U.S. 70, 74 (2006).

A decision is "contrary to" federal law "if the state court applies a rule different from the governing law set forth in" the Supreme Court's holdings, or if it decides a case differently than the Supreme Court has on a "set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 405-406 (2002). Relief is appropriate under the "unreasonable application" clause "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies it to the facts of the particular case." *Bell v. Cone*, 535 U.S. 685, 694 (2002).

An unreasonable application of law is, of course, different from an incorrect one. *Id*. A "federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (citing *Williams*, 529 U.S. at 411).

In this case, the relevant state court decision is the Vermont Supreme Court's September 8, 2006 decision that rejected the same claims Yoh now raises here. *Yoh*, 910 A.2d at 853.

**Discussion**

**I.      The Trial Court Properly Admitted Yoh's Confession**[4]

In *Miranda v. Arizona*, 384 U.S. 436, 442 (1966), the Supreme Court reacted to

what it believed to be the inherently coercive conditions of custodial interrogation by

creating "concrete constitutional guidelines for law enforcement agencies and courts to

follow."  *Dickerson v. United States*, 530 U.S. 428, 435 (2000) (quoting *Miranda*, 384

U.S. at 442).  Those guidelines, rooted in the Fifth Amendment privilege against

compelled self-incrimination, established that the admissibility of any statement made by

a suspect in police custody would depend on whether the suspect was given sufficient

notice of his constitutional rights and the consequences of waiving them.  *Id.*  These

rights include the Fifth Amendment rights to remain silent and to have counsel present

during custodial interrogation.  *Id.*; *Edwards v. Arizona*, 451 U.S. 477, 482 (1981); *see*

*also Malloy v. Hogan*, 378 U.S. 1 (1964) (holding that the Fifth Amendment privilege

against compulsory self-incrimination is incorporated in the Due Process Clause of the

Fourteenth Amendment and thus applies against the states).

---

[4] Because Yoh did not move to suppress his custodial statements at trial, he did not properly preserve this issue for appeal under Vermont law.  *Yoh*, 910 A.2d at 860 n.1.  However, as was the case in his consolidated appeal to the Vermont Supreme Court, this issue is also part and parcel of an ineffective assistance of counsel claim that was properly raised in his petition for post-conviction relief. Therefore, in the context of the ineffective assistance claim, this Court may consider whether the Vermont Supreme Court erred in finding that Yoh's confession was properly admitted.  *Id.*; *Strickland v. Washington*, 466 U.S. 668, 694 (1984).  Agreeing that the confession was admissible, and rejecting Yoh's claim on that basis, the Court need not consider whether the issue is properly raised in habeas independently of Yoh's ineffective assistance claim.  *See generally Acosta v. Artuz*, 575 F.3d 177, 185-88 (2d Cir. 2009).

Thus, the upshot of *Miranda* is a bright-line prophylactic rule: custodial statements made without the benefit "*Miranda* warnings" are not admissible in the prosecution's case-in-chief to prove guilt, even if the statements were not *actually* coerced. Without warnings sufficiently advising suspects of their rights, there is an irrebuttable *presumption* that inculpatory statements are made involuntarily. *Oregon v. Elstad*, 470 U.S. 298, 307 (1985). *Miranda* also requires investigators to immediately stop questioning a suspect when he invokes either his right to counsel or right to remain silent, and the *Miranda* presumption applies equally to statements elicited after an invocation of such rights. *Miranda*, 384 U.S. at 473-74; *Edwards*, 451 U.S. at 484.

Prior to *Miranda*, the admissibility of custodial confessions turned only on a *post hoc* determination of whether the confession was voluntarily made in accord with the Fifth Amendment and due process principles under the Fourteenth Amendment. *Dickerson*, 530 U.S. at 434; *Brown v. Mississippi*, 297 U.S. 278 (1936). Of course, "[t]he requirement that *Miranda* warnings be given does not . . . dispense with the voluntariness inquiry," *Dickerson*, 530 U.S. at 444, and statements that are actually coerced or made involuntarily cannot be salvaged by the magic words of a *Miranda* warning. *Id.*

In this case, Yoh contends that the statements made in his third custodial interview are inadmissible under either inquiry; that is, Yoh argues that his confession is both *presumptively* invalid under the prophylactic rules of *Miranda* and its progeny, and *actually* involuntary under traditional notions of due process. (Doc. 12 at 4.) I address each argument in turn.

## A.     Yoh's Confession Is Not Presumptively Involuntary

As an initial matter, there is no question that Yoh invoked his right to silence

during his second interview when Det. Nelson asked if he wanted to stop talking to the

detectives and Yoh replied, "yeah."  And although there is some dispute as to whether

Yoh unambiguously invoked his right to counsel as well, we may assume *arguendo* that

he did, for the analysis proceeds the same way in either case.[5]  *See Yoh*, 910 A.2d at 861.

Under *Miranda* and *Edwards*, the police are obligated to cease interrogation

immediately when a suspect invokes his rights, and any further statements that the police

elicit are presumed involuntary.  *Miranda*, 384 U.S. at 473-74; *Edwards*, 451 U.S. at 484.

This is true even when the suspect executes another waiver of rights–as Yoh did prior to

his third interview–before the subsequent statements are made.  "The *Edwards* rule is

'designed to prevent police from badgering a defendant into waiving his previously

asserted *Miranda* rights.'  It does this by presuming his post-assertion statements to be

involuntary, 'even where the suspect executes a waiver and his statements would be

considered voluntary under traditional standards.'"  *Montejo v. Louisiana*, 129 S.Ct.

2079, 2085 (2009) (quoting *Michigan v. Harvey*, 494 U.S. 344, 350 (1990); *McNeil v.*

---

[5] To be sure, the right to cut off questioning, i.e., to remain silent, and the right to counsel, are not always treated identically.  For example, a suspect that asks for counsel cannot be questioned again about *any* subject unless he initiates the discussion or counsel is present.  *Arizona v. Roberson*, 486 U.S. 675, 683 (1988).  When a suspect asks merely to stop the questioning, however, he may later be asked about an unrelated subject matter, even without counsel present.  *Michigan v. Mosley*, 423 U.S. 96, 103-105 (1975).  But here the subject of each interrogation was precisely the same–the disappearance and murder of Mary Yoh–and so each right carries with it the same implications: questioning must cease when asserted, and questioning may not resume unless the suspect initiates the discussion.

*Wisconsin*, 501 U.S. 171, 177 (1991)); *see also Minnick v. Mississippi*, 486 U.S. 146, 151-52 (1990).

But this presumption does not apply when it is the suspect himself, rather than the police, who initiates custodial communication.  *Edwards*, 451 U.S. at 484.  In *Edwards*, the Court found that a waiver and confession were presumptively invalid after police initiated questioning with a suspect who had invoked his right to counsel the day before.  But the Court also explained that, "we do not hold or imply that [the suspect] was powerless to countermand his [assertion of rights] . . . .Had [he] initiated the [second] meeting . . . nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at trial."  *Id.* at 485.

In this case, the Vermont Supreme Court did not apply a presumption of invalidity to Yoh's confession because Yoh initiated the third interview with police.  Relying on *Edwards*, the court explained that any confession made following the clear *Miranda* violation in the second interview would have been presumptively invalid and thus inadmissible.  *Yoh*, 910 A.2d at 861.  But since that interview ended without an admission from Yoh, and since Yoh initiated the interview in which he did confess, there was no presumption of invalidity and the only question was whether Yoh's "decision to initiate the third interview was voluntary[.]"  *Id.* at 861.

Yoh argues that the Vermont Supreme Court erred in its approach, and that once suspects assert their *Miranda* rights during a custodial interrogation, their ability to

13

initiate further police communication and offer voluntary statements depends on whether the police "scrupulously honored" their initial assertion of rights. (Doc. 12 at 8-10); *Michigan v. Mosley*, 423 U.S. 96, 103 (1975). When investigators ignore the suspect's assertion of rights, and fail to immediately stop questioning as *Miranda* and *Edwards* require, they forfeit the opportunity to elicit voluntary statements from the suspect, and the presumption of involuntariness that attaches to *Edwards* violations must apply. *See, e.g.*, *Collazo v. Estelle*, 940 F.2d 411, 427 (9th Cir. 1991) (Kozinski, J., concurring) ("In my view . . .[i]f police want to keep the *Edwards* escape hatch open, they must cease their interrogation as soon as the suspect asserts his right to counsel, and then hope he changes his mind on his own.").

Certainly, Yoh's proposed rule applies in cases where police attempt to continue the interrogation after an assertion of rights, "and then claim that the consequent response by the accused represented initiation and permitted a waiver of the asserted . . . right." *United States v. Gomez*, 927 F.2d 1530, 1538-39 (11th Cir. 1991); *see also Minnick*, 498 U.S. at 150 ("a valid waiver of th[e] right [to have counsel present during questioning] cannot be established by showing only that [the accused] responded to further police-initiated custodial interrogation[.]") (internal quotation marks omitted). Such cases are paradigmatic of those where judicial concerns of police "badgering" are most prevalent, and where claims of "suspect initiation" lack credibility in both substance and form. But it is an entirely different matter to extend the presumption over those cases in which the

tainted interrogation comes to a definitive end, and, while outside the presence of his

interrogators, the suspect changes his mind and decides to speak with police once again.

In this way, Yoh's case arrives at the intersection of two Supreme Court doctrinal

rules. On the one hand, it is a serious *Miranda* violation to continue interrogating after a

suspect decides to stand on his constitutional rights, and both subsequent waivers and

statements are presumed to be involuntary. On the other hand, suspects are free to initiate

further custodial discussions even after they assert their rights, and statements made

during such discussions are admissible so long as they are voluntarily made. *See Oregon

v. Bradshaw*, 462 U.S. 1039, 1044-46 (1983) (plurality). Suspects are free to change their

minds, but law enforcement agents may not badger them into doing so, and must respect

the rights to counsel and silence when asserted. The issue here is which proposition must

yield at this doctrinal crossroads.

I conclude that suspects in police custody are free to initiate discussions with law

enforcement even after an *Edwards* or *Mosley* violation, provided that the "initiation" is

not merely responding to post-assertion questioning, *see generally Bradshaw*, 462 U.S. at

1044-46, and provided it is done voluntarily. Thus, no presumption of invalidity should

apply to the statements made by Yoh during his third interview, and the relevant question

will be precisely as the Vermont Supreme Court framed it: whether Yoh's "decision to

initiate the third interview was voluntary[.]" *Yoh*, 910 A.2d at 861.

First, Yoh offers no case in which the *Miranda* and *Edwards* presumption is

applied under these circumstances. Yoh's reliance on the Ninth Circuit decision *Collazo*

*v. Estelle*, 940 F.2d 411 (9th Cir. 1991) (en banc) is misplaced.  In *Collazo*, a suspect in custody was given his *Miranda* warnings and questioned.  He waived his rights initially, but then asserted his right to counsel shortly into the interrogation.  Instead of ending the interrogation as *Edwards* requires, a detective continued to question the suspect, and suggested that acquiring an attorney "might be worse for you."  *Id*. at 413-14.  The interview ended after this admonition.  Three hours later, and after meeting with his wife, the suspect changed his mind and decided to initiate further communication with investigators.  The suspect was then re-Mirandized before he provided a confession.  *Id*. The Ninth Circuit decided that the confession was inadmissible, notwithstanding the suspect's apparent initiation of law enforcement contact.

Yoh cites the Ninth Circuit's observation that, "[t]his is not an example of the situation envisioned in *Edwards* when the Court carved out an exception for those suspects who 'initiate' further discussion.  Although the words and even the actions that could normally be construed as 'initiation' were present at the outset of the second encounter, an analysis of the substance of the entire transaction–rather than the isolated form of the second encounter–demonstrates that [the suspect] did not 'initiate' further conversation as that term is used in *Edwards*[.]"[6]  *Id*. at 423.  But the court specifically declined to decide whether the *Edwards* presumption of involuntariness should extend over the suspect's post-initiation confession, deciding instead that the suspect's "initiation

---

[6] In a lengthy dissent, Judge O'Scainnlan vehemently disagreed with this observation.  *Collazo*, 940 F.2d at 427-34. (O'Scainnlan, J., dissenting).

of the communication leading to the second interrogation was the product of coercive statements made by the police during the first, illegal interrogation." *Id*. at 420.[7]  In other words, the court did not rest its decision to suppress the confession on the mere fact of an *Edwards* violation during the first interview, but rather found that the detective's behavior violated "the general Constitutional prohibition against coercive interrogation practices likely to result in involuntary responses." *Id*. at 419.  Thus *Collazo* is inapposite, at least insofar as prophylactic protection is concerned.

Likewise, *Missouri v. Seibert*, 542 U.S. 600 (2004) (plurality) does not favor Yoh's position.[8]  In *Seibert*, the suspect was intentionally interrogated without the benefit of *Miranda* warnings until she confessed.  Then, after only a 20 minute break, investigators provided belated *Miranda* warnings and elicited the same confession once again.  The plurality observed that the suspect was essentially cross-examined about her prior unwarned confession during the second phase of the two-stage interrogation.  The plurality also noted that "[t]he unwarned interrogation was . . . systematic, exhaustive,

---

[7] *See also Collazo*, 940 F.2d at 420 ("[The State of] California assumes that following a Miranda violation the appropriate question is the same as it is if no such violation has previously occurred-that is, did Collazo initiate the communication that led to the incriminating statements? *We need not decide whether the state's view is correct*, because even assuming for the sake of argument that it is, we find as explained below that Collazo's initiation of the communication leading to the second interrogation was the product of the coercive statements made by the police during the first, illegal interrogation.") (emphasis added).

[8] Yoh apparently does not argue in this petition that *Seibert* supports the proposition that his confession is presumptively involuntary.  (Doc. 12 at 7-10.)  However, he did make this argument to the Vermont Supreme Court on direct appeal.  (Doc. 8-9 at 1-2.)

and managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid." *Id*. at 616.

Obviously, the initial unwarned confession was inadmissible under *Miranda*. But the Court found that *Miranda*'s prophylactic rule reached the second confession as well, because the preceding *Miranda* warnings could not have been "effective" under the circumstances. *Id*. at 617 n.8 ("Because we find that the warnings were inadequate, there is no need to assess the actual voluntariness of the statement."). The plurality explained that "[t]he threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires." *Id*. at 611-12. If not, "there is no practical justification for accepting the formal warnings as compliance with *Miranda*, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment." *Id*. And in his concurrence, Justice Kennedy suggested that mid-interrogation warnings should be regarded as ineffective when investigators deliberately ask questions first in order to render future *Miranda* warnings meaningless and ineffectual. *Id*. at 622 (Kennedy, J., concurring).

Thus, *Seibert* teaches that *Miranda* warnings given in the midst of a two-stage interrogation are presumptively ineffective under certain circumstances, and that statements following such warnings fall under *Miranda*'s prophylactic bright-line rule. Put differently, certain two-stage interrogations with mid-interrogation *Miranda* warnings are treated as though no *Miranda* warnings were given at all.

One could argue that Yoh's case presents an analogous situation, because, like Seibert, he was given *Miranda* warnings and then confessed following a prior interview in which a clear *Miranda* violation occurred.  But the similarities between Yoh and *Seibert* end there.  The *Miranda* violation in *Seibert* was a failure to provide warnings before questioning, and the suspect delivered a confession to police before she ever heard her rights.  Thus, the "cat was out of the bag," *see Elstad*, 470 U.S. at 311-12, and the suspect faced the unique pressure of an interrogator referring back to incriminating statements the suspect made just minutes before.  In contrast, the *Miranda* violation here is a failure to stop questioning, and Yoh did not make any incriminating statements in response to the improper interrogation.  Further, since the third interview would not have occurred but for Yoh's specific request made to the Pennsylvania state trooper, Justice Kennedy's concerns of a "deliberate two-stage interrogation" do not apply here.  In short, the specific circumstances that warranted a finding of ineffective warnings in *Seibert* are simply not present in Yoh's case, notwithstanding the serious *Miranda* violation that occurred in his second interview.[9]

---

[9] *Oregon v. Elstad* is further evidence that *Seibert* does not broadly apply to all cases in which a warned confession follows a *Miranda* violation of some kind.  470 U.S. 298.  Although *Elstad* involved the same basic framework as *Seibert*–i.e., an unwarned confession followed by *Miranda* warnings and a second confession–the Court found that "[i]t is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period."  *Id.* at 308; *see also United States v. Carter*, 489 F.3d 528, 536 (2d Cir. 2007) (holding that *Seibert* did not overrule *Elstad*, but rather created an exception "for cases in which a deliberate, two-step strategy was used by law enforcement."); *see also Garvin v. Farmon*, 258 F.3d 951, 956-57 (9th Cir. 2001).

It is also clear that the Supreme Court's *Miranda* jurisprudence counsels against applying a presumption of involuntariness in this case. Applying the presumption here would effectively create an entirely new level of prophylactic protection that the Supreme Court has never before recognized, and that would unjustifiably undermine the ability of the accused to make their own autonomous choices about the course of their interaction with law enforcement.

Under Supreme Court law, three layers of prophylaxis are already in place: (1) the requirement of *Miranda* warnings themselves, and the rule that all unwarned statements are presumed involuntary; (2) the derivative obligation to cease interrogation after *Miranda* rights are invoked, and the rule that post-assertion statements made without counsel are presumed involuntary; and (3) the rule that presumes not only post-assertion statements, but also post-assertion *waivers*, to be involuntary. Adopting Yoh's approach would add a fourth: the presumption that, even after the interrogation in which the right is asserted and the *Edwards* violation takes place concludes, and the suspect and his interrogators part ways, any further initiation *by the suspect* is involuntary.

Yoh may object that his argument is not really so demanding; he may say that there is no real distinction between the third and fourth levels of prophylaxis because, given the *substance* of the *Miranda* violation in this case, his "initiation" was nothing more than the delayed product of the police misconduct, and therefore should not be treated as suspect-initiation at all. *See*, *e.g.*, *Collazo*, 940 F.2d at 420-23. But to succeed, this argument requires a showing of *actual involuntariness*, and in no way shows that the

mere fact of an *Edwards* violation renders Yoh's subsequent waiver and confession *presumptively* invalid. After all, this is *not* a case in which the suspect merely responded to post-assertion questions. Instead, Yoh's second interview came to an end without a confession, and he changed his mind outside both the interrogation room and the presence of his interrogators.

Such fourth order prophylaxis is not only absent from the Supreme Court's jurisprudence, but would undermine the Court's general recognition that "[t]he 'ready ability to obtain uncoerced confessions is not an evil but an unmitigated good,'" *Montejo*, 129 S.Ct. at 2091 (quoting *McNeil*, 501 U.S. at 181), and that suspects who wish to speak voluntarily to law enforcement–whether out of a "commendable qualm of conscience or [a] fortunate fit of stupidity"–are free to do so. *Dickerson*, 530 U.S. at 449-50 (Scalia, J., dissenting); *see also Edwards*, 451 U.S. at 490-91 ("this Court consistently has 'rejected any paternalistic rule protecting a defendant from his intelligent and voluntary decisions about his own criminal case.'" (Powell, J., concurring) (quoting *Mosley*, 423 U.S. at 109) (White, J., concurring). In this vein, the Supreme Court has consistently reiterated that whatever prophylactic rule may stand in between law enforcement and a criminal suspect, it will be superseded by the suspect's voluntary decision to initiate law enforcement communication. *See Montejo*, 129 S.Ct. at 2085; *Minnick*, 498 U.S. at 150; *Arizona v. Roberson*, 486 U.S. 675, 681 (1988); *Bradshaw*, 462 U.S. at 1044-46 (plurality); *Edwards*, 451 U.S. at 484-85. To preclude such initiation *per se* based solely on police misconduct–misconduct, it should be noted, that need not even be coercive–would truly

21

be to "imprison a man in his privileges and call it the Constitution." *Montejo*, 129 S.Ct. at 2086 (citing *Adams v. United States ex. rel. McCann*, 317 U.S. 269, 280 (1942)).

To be sure, the Court has established that waivers of rights following an *Edwards* or *Mosley* violation are presumptively invalid, a rule designed to prevent police from "badgering" suspects into changing their minds about their assertion of rights. *Harvey*, 494 U.S. at 350. But the badgering justification carries far less weight in cases where the badgering ostensibly does not work, that is, when the police give up and end the interrogation having received neither a waiver nor a confession, and subsequent custodial statements come only at the suspect's request.

Applying the same presumption of involuntariness in such cases would lead to absurd results that are incongruent with the anti-badgering theory of presumptively involuntary waivers. For example, an individual who speaks with his priest and then begs for the sake of his soul to confess would be barred from doing so voluntarily, all because earlier in the day (or week, or month) the police asked him questions after he asserted his right to silence.

Perhaps Yoh wants the presumption to apply in a more limited way, such as by excluding those cases in which suspects are able to speak with a (non-lawyer) confidant, or where there is a substantial amount of time between the *Edwards* violation and the suspect-initiation, or where the *Edwards* violation itself is relatively innocuous. But such an approach departs from the realm of bright-line prophylactic rules, and enters the kind of fact-dependent totality-of-the-circumstances analysis more appropriate for inquiries

22

into *actual* voluntariness.[10]  Thus, regardless of the *nature* of an *Edwards* violation, suspect-initiation is the "break in the stream of events" separating the violation from subsequent inculpatory statements.  Of course, a criminal defendant is free to argue that his initiation was itself compelled, but that is a separate question.

In sum, "the proposition that police misconduct creates a *per se* violation of *Miranda* that subsequent voluntary acts of the accused can never render harmless," finds no support in Supreme Court precedent, and I decline to adopt it here.  *Collazo*, 940 F.2d at 433 (O'Scainnlan, J., dissenting).  Moreover, there is little practical reason to extend the presumption of involuntariness typically attached to *Edwards* violations, because the concern of police "badgering" is far less pronounced when an interrogation ends without a confession, and the suspect initiates further law enforcement contact on his own accord.  Similarly, extending the *Edwards* presumption here would not further serve the goal of deterring police misconduct, since statements made in response to an *Edwards* violation are already presumed involuntary in the absence of suspect-initiation.  *See generally Elstad*, 470 U.S. at 308-309.

Of course I agree that the *Edwards* presumption applies where the supposed suspect-initiation amounts to nothing more than responses elicited by further post-assertion questioning, *see*, *e.g.*, *Gomez*, 927 F.2d at 1538-39, but it is not difficult to

---

[10] The Supreme Court has yet to recognize such limitations in a pure-*Edwards* case, i.e., when the police try to resume questioning after the suspect asserts his rights and there is no suspect-initiation.  In fact, the Court recently heard argument to decide whether the *Edwards* presumption extends to cover someone who invoked his right to counsel over two years before police re-questioning.  *Maryland v. Shatzer*, S.Ct. Doc. No. 08-680 (Argued Oct. 5, 2009).

distinguish Yoh's third interview from such cases. Yoh did not confess during the interview in which Det. Shortsleeve violated his *Miranda* rights. Instead, the interview indisputably and unambiguously ended, and the next interview commenced only because Yoh decided, outside the presence of his interrogators, that he wanted to waive his rights and speak to law enforcement a third time. No presumption applies to Yoh's statement.

There is no question that the Vermont Supreme Court's decision gave short shrift to Yoh's claim of presumptive involuntariness; indeed it seems the court merely assumed he "was entitled to initiate further conversation," and believed the only question to be decided was whether his initiation was voluntary. *Yoh*, 910 A.2d at 327. Although the state court's decision failed to illustrate the issue's complexity, I believe that it was ultimately correct, and thus cannot conclude that the decision on this point is either contrary to, or an unreasonable application of, *Miranda* and its progeny. 28 U.S.C. § 2254(d).

Having concluded that Yoh's confession is not presumptively invalid, its admissibility turns on the issue to which I now turn: whether his decision to initiate law enforcement contact and waive his rights was voluntarily made. *Bradshaw*, 462 U.S. at 1044-46; *Edwards*, 451 U.S. at 484 n.9.

**B.      Yoh Voluntarily Waived His Rights And Confessed**

The Due Process Clause of the Fourteenth Amendment does not permit the admission of confessions that are the product of coercion, or that were made by defendants who did not knowingly and voluntarily waive their Fifth Amendment right

against compelled self-incrimination. *Dickerson*, 530 U.S. at 434.

"The inquiry into whether a waiver is coerced 'has two distinct dimensions: First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Colorado v. Spring*, 479 U.S. 564, 573 (1987) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). Yoh does not dispute that he waived his rights knowingly, but insists that his waiver and confession were given involuntarily.

As the Vermont Supreme Court correctly identified, the voluntariness of both waivers and confessions is judged by examining the totality of the circumstances surrounding the interrogation to determine whether the defendant's will was so overborne that his capacity for self-determination was critically impaired. *Dickerson*, 530 U.S. at 434 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)); *Spring*, 479 U.S. at 573; *Yoh*, 910 A.2d at 863.

No single criterion controls whether an accused's confession is voluntary: "whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances." *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir. 1997) (quoting *Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988)). Relevant factors include the accused's characteristics, the conditions of the interrogation,

and the conduct of law enforcement officials, including whether a *Miranda* violation

occurred. *Id*; *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 346 (2d Cir. 1998).

Of course, Yoh does not allege any improprieties during the interrogation in which

he actually confessed. Instead, he argues that the police conduct during the second

interview–including the *Miranda* violation–compelled him to initiate the third interview

and confess. Thus, I must consider whether the circumstances surrounding Yoh's second

interview "were so coercive as to prevent him from making a subsequent knowing and

voluntary waiver of his rights, thereby requiring the suppression of his" later confession.[11]

*Tankleff v. Senkowski*, 135 F.3d 235, 242 (2d Cir. 1998). I conclude that they were not.

*Elstad* provides a measure of guidance as to whether coercive circumstances in one

interrogation can be imputed to a subsequent, independently innocuous, interrogation.

There, the Court said that "[w]hen a prior *statement* is actually coerced, the time that

passes between confessions, the change in the place of interrogations, and the change in

the identity of the interrogators all bear on whether that coercion has carried over into the

second confession." 440 U.S. at 310 (emphasis added). In *Elstad*, however, the Court

envisioned a case in which coercive conduct immediately produced a statement–i.e.,

where there was not only *coercive* conduct, but actual *coercion* resulting from that

conduct–and in which the police initiated the subsequent conversation. *Id*. Thus, while

---

[11] The Vermont Supreme Court made no findings as to whether the tactics employed by the Vermont state detectives during the second interview were unduly conducive. *Yoh*, 910 A.2d at 863. Instead, the court found no link between those tactics and Yoh's "decisions to initiate the third interview, waive his *Miranda* rights a third time, and make a confession." *Id*.

such factors may be relevant to the totality of the circumstances present here, this test cannot be strictly applied.

First, Yoh directs the Court to one factor that can be quickly dismissed as irrelevant. He complains that the detectives lied about the scope of the investigation, acting at first as though Mary was only a missing person. (Doc. 12 at 20.) Regardless of the propriety of this technique, however, it is merely a red herring in the argument that Yoh was coerced. Yoh did not confess when they told him Mary was alive, and he later waived his rights when he knew full well that he was the subject of a murder investigation. It makes no sense to say that lies about the scope of the investigation at Yoh's second interrogation coerced him into waiving his rights and confessing later, at which point he knew precisely why the police wanted him to talk. *Cf. Spring*, 479 U.S. at 567-68 (considering this issue regarding a suspect who waived his rights *before* police revealed the full scope of investigation).

In addition to this purely makeweight consideration, Yoh emphasizes the detectives' conduct along with his lack of sophistication and the physical conditions under which he confessed. In particular, he notes that the detectives lied about physical evidence linking Yoh to the crime, threatened a long prison sentence, claimed that it was in Yoh's best interest to confess immediately and to portray the killing as accidental, and took improper advantage of Yoh's sensitivity about his family. (Doc. 12 at 13-24.) I will initially assess the implications of each in turn, however all of these and other relevant

facts must ultimately be considered together, in sum, to evaluate the voluntariness of Yoh's decisions.  *Green*, 850 F.2d at 901.

### i. Misrepresentations About Existing Evidence

Yoh argues that Det. Shortsleeve's lies about the strength of the evidence–including fabrications about forensic evidence taken from Yoh's car, his hotel room, and Mary's body–were coercive, and unfairly contributed to Yoh's decision to confess.  (Doc. 12 at 18-20.)

While lies about evidence are relevant to the voluntariness determination, both the Supreme Court and the Second Circuit recognize that such falsehoods do not render a confession involuntary *per se*.  *Frazier v. Cupp*, 394 U.S. 731, 739 (1969); *Green*, 850 F.2d at 894.  Indeed, of "the numerous varieties of police trickery . . . a lie that relates to a suspect's connection to the crime is the least likely to render a confession involuntary." *Holland v. McGinnis*, 963 F.2d 1044, 1051 (7th Cir. 1992).  Such lies do not add any extrinsic considerations to the suspect's own beliefs about his culpability or moral sense of right and wrong, and do not impose a duty on the suspect to confess in order to avoid some consequence completely unrelated to the suspect's guilt or innocence of the crime. *Cf. Lynumn v. Illinois*, 372 U.S. 528, 533-34 (1963) (concluding that the defendant's confession was coerced when the police implied that she would lose custody of her children and her state financial benefits if she did not cooperate); *Spano v. New York*, 360 U.S. 315 (1959) (misrepresentation by the suspect's friend that the friend would lose his

job as a police officer if the suspect failed to cooperate rendered his statement involuntary).

Accordingly, cases in this Circuit and elsewhere routinely permit the use of confessions obtained after evidentiary misrepresentations, even when they are of the kind that a completely innocent person could believe to be true. *See Tankleff*, 135 F.3d at 245 (lie told to 17 year-old suspect that his father awoke from a coma and implicated him did not "irredeemably taint" a confession given after subsequent *Miranda* warnings); *Frazier*, 394 U.S. at 737 (false statement by police that co-defendant had confessed did not render confession involuntary); *Holland*, 963 F.2d at 1051 (false claim that a witness had seen the defendant's vehicle at the crime scene); *Lucero v. Kerby*, 133 F.3d 1299, 1311 (10th Cir. 1998) (misrepresentation pertaining to fingerprint evidence found in the victim's home); *Ledbetter v. Edwards*, 35 F.3d 1062, 1066 (6th Cir. 1994) (falsified fingerprint comparison chart, claim that three witnesses had identified defendant, and staged victim identification).

### ii. The Detectives Advise Yoh To Confess, And State He Must Do So Immediately

Yoh argues that the detectives' most egregious conduct came in the form of "threats and promises" that induced his confession, suggesting that he would be better off if he confessed, and that he would have no future opportunity to do so. (Doc. 12 at 13.) First, Yoh's argument on this point somewhat misstates the record. Detective Shortsleeve did try to convince Yoh that it was in his interest to confess, making comments such as,

"[y]ou need to decide if this can be knocked down to manslaughter, something with minor or lesser degree. . . . You tell us she pushed you into something and it was accidental we're going to have it on tape here. Otherwise it's going to look like it's premeditated[.]" (Doc. 7-23 at 102.) He also mentioned to Yoh the possibility of staying in jail until "you're 90 years old." *Id*. at 103. But Shortsleeve made no specific promises of leniency or preferential treatment in exchange for a confession; rather, he merely conveyed the common sense notion that premeditated murder is generally more severe than accidental death.

Yoh is also incorrect to the extent he believes that it is impermissible for police to persuade suspects to cooperate. In general, "[i]t is not improper to 'mention the situation which [the defendant] faced and the advantages to him if he assisted the government.'" *United States v. Alvarado*, 882 F.2d 645, 650 (2d Cir. 1989) (quoting *United States v. Pomares*, 499 F.2d 1220, 1222 (2d Cir. 1974)). And once Yoh "had been advised of his rights, the [detectives] were free to discuss with him the evidence against him and the reasons why he should cooperate." *United States v. Tutino*, 883 F.2d 1125, 1138 (2d Cir. 1989). For example, in *Pomares*, the Second Circuit found nothing improper about a defendant being told by federal agents that he faced "heavy penalties," that "he was his own best lawyer," and "that the wisest course of action would be to cooperate with the government." *Pomares*, 499 F.2d at 1222-23.

The impropriety of telling Yoh that he must confess immediately, that "you're not going to get another opportunity," and "[w]e're not going to interview you after today," is

a closer question. (Doc. 7-23 at 102-103.) Yoh relies on cases in which confessions were deemed involuntary because police told the accused he could not cooperate if he retained a lawyer. *See*, *e.g.*, *United States v. Anderson*, 929 F.2d 96, 98, 102 (2d Cir.1991) (holding that the agent's statement that speaking with a lawyer would permanently preclude the defendant from cooperating with police rendered the defendant's first confession involuntary); *Collazo*, 940 F.2d at 417 (telling the suspect that he might be "worse off" if he retains a lawyer "effectively told [the suspect] that he would be penalized if he exercised his rights guaranteed to him under the Constitution of the United States.").

Such cases are distinguishable, however, because the Vermont detectives never specifically told Yoh that he would be worse off, or that cooperation would be precluded, if he retained counsel. In other words, the police did not tell Yoh that he would be "penalized" for exercising a constitutional right. Shortsleeve did tell Yoh that he would not have another chance to cooperate, but not *because* Yoh wanted an attorney or wanted to cut-off questioning. Rather, the chance to confess would be lost, said Shortsleeve, because "[w]e don't need a confession from you we got a good case," and "[w]e don't care if you say it was accidental or if it wasn't, cause we've got a good case for premeditated." (Doc. 7-23 at 102-103.) Simply put, unlike in *Anderson* and *Collazo*, there was no benefit Yoh would have received, or some penalty he would have avoided, but for his decision to exercise a constitutional right. *See also United States v. Ruggles*,

70 F.3d 262, 265-66 (2d Cir. 1995) (finding that there was "nothing improperly coercive" about an agent telling a suspect that he would not interview the suspect again).

### iii.    The Police Mention Yoh's Family

Yoh argues that Det. Shortsleeve improperly "played" on Yoh's "sensitivity" about protecting his family. Early in the second interrogation Yoh told the Vermont detectives that he wanted his family left alone, and that law enforcement should not "drag my family into this" and "[t]hey don't mess with my kids[.]" (Doc. 7-23 at 39.) Det. Shortsleeve tried to assure Yoh that the police were only asking his family questions, but Yoh insisted that, "[t]hey keep my kids out of it." *Id*. Near the end of the interview, and after Yoh asserted his rights, Shortsleeve said that, "[y]ou know we're talking to your family, you want to leave them with any good feelings, let us be able to tell them that this was an accidental thing." *Id*. at 103. Later, Yoh initiated the third interview by telling one of the Pennsylvania State troopers that, "if you can keep [the Vermont detectives] off my family I will tell them everything they want to know." (Doc. 7-20, Trial Tr. vol. 2, 27.)    The Vermont Supreme Court found that Yoh confessed in order to stop the police from questioning his family, and that this motive was the "break in the stream of events" separating Yoh's confession from the earlier *Miranda* violation. *Yoh*, 910 A.2d at 862. Yoh argues not only that this motive failed to "insulate" his confession from the violation, but that it was the direct result of Shortsleeve's improper tactics. (Doc. 12 at 26.)

The problem with Yoh's position is that, aside from coming after Yoh asked questioning to stop, Det. Shortsleeve did nothing improper by mentioning Yoh's family.

Indeed, at oral argument Yoh's counsel conceded as much. Shortsleeve did not threaten Yoh's family, or say that his family would suffer harm if Yoh did not confess. He merely said that the police were "talking" to Yoh's family, something that is a normal part of any criminal investigation, and that would be a forgone conclusion for virtually anyone in police custody. Moreover, as Yoh also concedes, it is something of which he was entirely aware even before the Vermont detectives began their first interrogation. (Doc. 12 at 22.)

### iv. Yoh's Personal Characteristics

There is little about Yoh's personal traits that warrants significant concern. Yoh was in early 40s at the time of the interrogations, and was thus neither elderly nor a juvenile. And while evidently not a grammarian by trade, Yoh spoke clearly and cogently, and plainly understood what was occurring throughout the duration of each interrogation. Yoh may not have been a veteran of the criminal justice system (though he had been in trouble with the law before), but he was savvy and comfortable enough to negotiate a cigarette break during his third interview, and to tell the officers that he wanted his family left alone. (Doc. 7-23 at 105.)

This, of course, is not to say that Yoh's personal traits are irrelevant–one can easily imagine a defendant who is *less* susceptible to coercion–but only to say that Yoh was not unfairly vulnerable or uniquely incapable of resisting the inherent pressures of custodial interrogation.

### v. Physical Conditions Of The Interrogation

The "physical factors" attendant to the interrogation were not particularly severe. Yoh emphasizes the length of the interview, his ignored request to eat lunch, and the fact that he was "shackled" during the interrogations. (Doc. 12 at 23.) In fact, Yoh's second interrogation lasted less than three hours, a hardly remarkable amount of time that does not suggest any greater level of coercion than is inherent in custodial interrogations to begin with. *Cf. Williams v. Norris*, 576 F.3d 850, 868-69 (8th Cir. 2009) ("Questioning a suspect for thirteen hours is not unconstitutional *per se*"). Yoh also had an interview with Pennsylvania authorities, but that was two days prior and lasted only about an hour. (Doc. 12 at 23; Doc. 7-20, Trial Tr. vol. 2, 29-30.)

### vi. The Totality Of The Circumstances

Considering all of these factors together along with the fact that a *Miranda* violation occurred, the record shows that Yoh's decision to waive his rights was both knowing and voluntary, and that Yoh was not compelled to initiate the third interview in which he confessed. Yoh's claim of coercion would be stronger had he confessed in response to the *Miranda* violation, the fabricated evidence, and the demands of immediate cooperation, before the second interrogation ended. But that is not the case here.

Yoh did not confess during the second interview, and was free from interrogation when he decided to speak to law enforcement again. Yoh confessed only after initiating law enforcement contact and waiving his right to remain silent for the *third time*, two facts that are "highly probative." *Elstad*, 470 U.S. at 318. The record also amply

34

supports the state court's finding that Yoh initiated the third interview "to stop the police from questioning his family." *Yoh*, 910 A.2d at 328; *see Green*, 850 F.2d at 903-904 (finding confession to be voluntary because, in part, the defendant told police he confessed so he would not commit more crimes, thus negating the influence of police conduct that included lies about evidence). Whatever coercive conduct occurred during the second interview–and as I explained above, nothing occurred that would have alone rendered a confession involuntary[12]–I agree with the Vermont Supreme Court that it was not enough to "irredeemably taint" Yoh's later confession. *Tankleff*, 135 F.3d at 245; *Yoh*, 910 A.2d at 863.

Finally, there is no evidence to suggest that the *Miranda* violation caused Yoh to believe that his rights were ineffective or meaningless. Quite to the contrary, the record shows that Yoh understood–quite correctly–that his rights exist independently of police interrogators and their misconduct. Yoh essentially remained silent after asserting his rights, not responding to any of Shortsleeve's virtual soliloquy except to say "I don't know what you're talking about," and, "I had nothing to do with it." (Doc. 7-23 at 101-103.) He then conditioned his third interview on a cigarette break and police staying away from his family, *Id*. at 104-105, and acknowledged that he was "probably hanging myself, talking to you without a lawyer." *Id*. All of this reflects Yoh's understanding of

---

[12] *See Miller v. Fenton*, 474 U.S. 104, 116 (1985) ("[T]he admissibility of a confession turns as much on whether the techniques for extracting the statements as applied to *this* suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether the defendant's will was in fact overborne.").

his rights to remain silent and to have counsel, and that any statements he made could be used against him. Yoh knowingly waived his rights and confessed voluntarily. It was not constitutional error for the trial court to admit his statements.

## II.     Yoh's Ineffective Assistance Claim Fails

Sixth Amendment ineffective assistance of counsel claims are governed by the two-part standard in *Strickland v. Washington*, 466 U.S. 668, 688 (1984). In order for Yoh's claim to succeed, he must "(1) 'demonstrate that his counsel's performance fell below an objective standard of reasonableness' . . . *and* (2) 'affirmatively prove prejudice' arising from counsel's allegedly deficient representation." *United States v. Cohen*, 427 F.3d 164, 167 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 688) (emphasis added).

Yoh concedes that if the trial court properly admitted his confession, then he cannot show prejudice resulting from his lawyer's failure to move for suppression. (Doc. 12 at 27.) In light of the Court's finding that Yoh's confession was admissible, Yoh's ineffective assistance claim must fail.

## III.     Yoh Is Not Entitled To An Evidentiary Hearing

Yoh seeks an evidentiary hearing to establish that (1) he believed he had "no choice" but to give a confession, i.e., that his will was in fact overborne; and (2) his counsel's performance was objectively unreasonable. (Doc. 12 at 29-31.)

AEDPA did not change the basic rule that the decision to grant an evidentiary hearing is generally left to the sound discretion of the district court. *Schriro v. Landrigan*,

550 U.S. 465, 473 (2007) (citing *Brown v. Allen*, 344 U.S. 443, 463-64 (1953); *Townsend v. Sain*, 372 U.S. 293, 313 (1963)).  In general, district courts must review the record and "consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Id*. at 474; 28 U.S.C. § 2254, Rule 8(a).  And "[b]ecause the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate." *Landrigan*, 550 U.S. at 473.  If the record refutes the petitioner's factual allegations or otherwise precludes habeas relief, then courts have the discretion to dismiss the petition without an evidentiary hearing.  *Id*. at 474.

§ 2254(e)(2), however, strictly limits this discretion "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings."  A "failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor*, 529 U.S. at 432.  In such cases the court shall not hold an evidentiary hearing unless one of two specific exceptions (neither of which have relevance here) apply.  28 U.S.C. § 2254(e)(2)(A)-(B).

Although I agree with the Respondent that no hearing is warranted in this case, I do not adopt his suggested reasoning.  The Respondent argues that § 2254(e)(2) applies because Yoh agreed to dismiss the remaining portions of his PCR petition in Vermont Superior Court, and to forego any further opportunity to develop the factual record, as

37

part of his re-sentencing agreement. (Doc. 8 at 38-39.) Therefore, according to the Respondent, Yoh not only "failed to develop" the state court record, he affirmatively forfeited his right to do so.

The problem with the Respondent's argument is glaring. As described above, the Vermont Supreme Court affirmed summary judgment against Yoh on his claims that his confession was involuntary and that his counsel was ineffective for not seeking its suppression, thereby exhausting all of Yoh's possible state court remedies as to those claims. *Yoh*, 910 A.2d at 863, 868. The court did remand a *portion* of Yoh's PCR petition to the Superior Court, but *only* "on the issue of whether [his counsel's] advice . . . prior to trial was sufficient to allow [Yoh] to make an informed choice of trial strategies," and *not* to decide whether Yoh's confession was voluntarily made. *Id.* at 870. Thus, when Yoh agreed to dismiss the remanded PCR petition, the claims he now brings in federal court were no longer part of the petition, and the Vermont courts had eliminated any further opportunity to offer evidence on those claims. Under these circumstances, it would be wholly unreasonable to hold that Yoh forfeited his opportunity to develop the evidentiary record by dismissing a PCR petition from which, at that point, the present claims were entirely absent.

Instead, I conclude that the existing record sufficiently refutes Yoh's factual allegations, and that dismissal without taking further evidence is therefore appropriate. Yoh relies solely on his affidavit filed with his PCR petition to show that there is a disputed fact as to his subjective state of mind when he confessed. (Doc. 12 at 29-30.)

He claims that the state courts improperly ignored this evidence (or improperly found it to be not credible) by deciding on summary judgment that his confession was voluntary, and denying his requests for an evidentiary hearing.[13]  (Doc. 8-9 at 4; Doc. 12 at 29.)  In addition, he plans to call a psychiatrist to corroborate his affidavit.  *Id.*

There are two paragraphs in Yoh's affidavit that he contends are relevant to whether he voluntarily confessed.  The first paragraph, however, only describes Yoh's state of mind in the second interview, before he confessed.  It says that he "didn't know what to do" when the detectives failed to cease the second interrogation.  He said that the "officers just ignored" him, and that he "was getting scared and feeling hopeless and confused."  (Doc. 24-3, Yoh. Aff. ¶ 19.)[14]  Such concerns would be pertinent if Yoh confessed as a means to end the interrogation he could not otherwise stop, but that is not what happened.  Once Yoh asserted his rights he stopped responding substantively, and he did not confess until he initiated a subsequent interview.  Thus, even if these

---

[13] Of course, there was no suppression hearing at trial because Yoh's counsel did not move to suppress the confession.  But since Yoh now brings an ineffective assistance claim on that precise point, it would beg the question to say that Yoh "failed to develop" these facts at trial, and to conclude that an evidentiary hearing is therefore not permitted.

[14] The paragraph in its entirety states: "I agreed to speak to the Vermont police officers the last time, where I said what happened at the Radisson, for several reasons.  I wanted them to leave my family alone.  I also wanted to be cooperative with them.  I had tried several times to stop them from questioning me and accusing me of killing Mary.  I had even told them I wanted a lawyer to get them to stop.  When I said 'a lawyer or something,' I didn't mean a lawyer or someone who wasn't a lawyer.  I meant a lawyer or a public defender, or whatever they are called in Pennsylvania.  I always thought that if you told them you didn't want to talk anymore and that you wanted a lawyer that they had to stop and leave you alone.  That's what the officers told me too at the beginning of the interview.  But that wasn't done.  That's not what happened.  The officers just ignored me.  It was like it didn't matter to them.  I didn't know what to do.  I felt tired.  I was also hungry and had kept telling them I wanted some food but they wouldn't listen to that either.  I was getting scared and feeling hopeless and confused."  (Doc. 24-3, Yoh Aff. ¶ 19.)

averments are true, they are not probative of whether Yoh's ultimate confession was voluntary.

In the second paragraph, however, Yoh states that he "couldn't help it" when he confessed, and that he "felt like he had no choice." *Id.* ¶ 20.[15] Such statements could be relevant to a determination of voluntariness, but they contradict both Yoh's prior sworn trial testimony and the rest of the factual record. At trial, Yoh said he confessed "[b]ecause of the pressure. I didn't want it over my family and brought back here." (Doc. 7-21, Trial Tr. Vol. 3, 50:6-8, Oct. 15, 1999.) Yoh's counsel also summarized this testimony during his summation, saying, "[h]e simply wanted the police to leave his family in Pennsylvania alone, and so he agreed to give that final statement. He lied to the police about what he knew because he was alone, he was scared, and he felt no one wanted to hear the truth." *Id.* at 36:4-8. During his testimony Yoh did not indicate that he was compelled, or that he believed he had no choice but to confess. Thus, as the Vermont Supreme Court reasonably concluded, Yoh's trial testimony was not that his confession was coerced, but rather that his statement, while voluntary, was false. *Yoh*, 910 A.2d at 869.

Because Yoh's affidavit is inconsistent with his prior sworn testimony, it cannot create an issue of disputed fact, and it does not necessitate an evidentiary hearing in

---

[15] The paragraph in its entirety states: "Then after everything they were saying about this being my last and only chance to help myself or else I was going to prison for basically my whole life, –the train is leaving the station–I decided I better talk to them and tell them something. Part of me knew I shouldn't talk to them, but yet I couldn't help it. I felt like I had no choice." (Doc. 24-3, Yoh Aff. ¶ 20.)

federal court. *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 572 (2d Cir. 1991) ("[A] party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony."); *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969) ("a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.").

And, even if Yoh's affidavit is considered, the assertions contained therein are overwhelmingly refuted by the existing record, making further evidentiary proceedings unnecessary. *See Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005); *Landrigan*, 550 U.S. at 474. As already discussed, the interrogation transcripts and audio recordings (Doc. 22), along with the trial testimony from Yoh and Det. Shortsleeve, show clearly that Yoh understood his rights at all times, that he confessed only after initiating a third interview himself, and that the *Miranda* violation did not cause–let alone *compel*–his confession.

For these reasons, Yoh's affidavit does not create the need for a hearing–either now or earlier in the state courts–to resolve the issue of voluntariness. *See Miller v. Fenton*, 474 U.S. 104, 112 (1985) (holding that "whether, under the totality of the circumstances, [a] challenged confession was obtained in a manner compatible with the

requirements of the Constitution is a" question of law).[16]

Additionally, § 2254(e)(2) precludes the consideration of expert testimony on voluntariness because Yoh did not offer that evidence during the pendency of his PCR petition. Yoh offered the opinions of a *legal* expert as to whether his trial counsel's performance was reasonable, but no expert testimony regarding Yoh's subjective state of mind. (Docs. 25; 7-25 at 42, Pet. Statement of Material Facts ¶¶ 61-62.) Other Circuits have found such omissions to represent a lack of diligence that constitutes a "fail[ure] to develop the factual basis of a claim" within the meaning of § 2254(e)(2). *See Dowthitt v. Johnson*, 230 F.3d 733, 758 (5th Cir. 2000) ("Mere requests for evidentiary hearings will not suffice; the petitioner must be diligent in pursuing the factual development of his claim."); *Cannon v. Mullin*, 383 F.3d 1152, 1176-77 (10th Cir. 2004) (same); *Boyd v. Waymart*, 579 F.3d 330, 374-75 (3d Cir. 2009) (Hardiman, J., dissenting) (collecting cases).[17] Yoh now complains that the Vermont Superior Court granted summary judgment against him, but his affidavit was the only evidence he submitted to create an issue of fact. Yoh could have offered additional expert testimony at that time to oppose the State's motion for summary judgment, but he chose not to. Because Yoh was not

---

[16] Since neither state court "unreasonably failed to permit" Yoh from developing the main facts necessary to support his claim, any additional facts found in federal court would "have no bearing whatsoever on whether [the] state court[s'] findings of fact constituted an 'unreasonable determination'" within the meaning of § 2254(d)(2). *Wilson v. Mazzuca*, 570 F.3d 490, 501 n.10 (2d Cir. 2009). New facts could only be relevant to the question of whether the Vermont Supreme Court decision unreasonably applied, or is contrary to, federal law. *Id.*

[17] Having already concluded that the presence of Yoh's affidavit in the record does not necessitate an evidentiary hearing, I need not decide whether Yoh's lack of diligence in presenting expert evidence in state court would *entirely* preclude an evidentiary hearing under 28 U.S.C. § 2254(e)(2).

diligent in developing the full factual basis of his claim in state court, the actual content of his proposed expert evidence remains largely speculative. While Yoh has submitted a letter from Dr. Philip J. Kinsler (Doc. 24-2), it offers little by way of specificity, and the record is currently devoid of any expert testimony, reports, or affidavits supporting Yoh's claim that his confession was compelled.

Finally, having concluded that Yoh's confession was voluntary–and therefore that the absence of a suppression motion did not cause prejudice–there is no need to take further evidence on whether his counsel's performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 697.

## Conclusion

Even under a less deferential standard of review, I would not recommend granting the Petitioner's requested relief. I agree with the Vermont Supreme Court on the merits that Yoh's confession was admissible, and that, as a result, his ineffective assistance of counsel claim is without merit. Consequently, I also find that the Vermont Supreme Court's decision was neither contrary to, nor an unreasonable application of, federal law, and was not "based on an unreasonable determination of the facts[.]" 28 U.S.C. § 2254(d)(1)-(2).

Accordingly, I recommend that Yoh's Petition and Motion for an Evidentiary Hearing (Docs. 2 & 12) be DENIED, and that Respondent's Motion to Dismiss (Doc. 8) be GRANTED. In light of these conclusions, I also recommend that Respondent's Motion to Strike (Doc. 9) be DENIED as moot.

Dated at Burlington, in the District of Vermont, this 4th day of November, 2009.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within 10 days after service by filing with the clerk of the court and serving on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. Failure to file objections within the specified time waives the right to appeal the District Court's order.  See Local Rules 72.1, 72.3, 73.1; 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b), 6(a) and 6(e).